# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **FST Express, Inc.** | : | |
| **2040 Atlas Street** | : | |
| **Columbus, Ohio 43228,** | : | |
| | : | |
| **and** | : | **Case No. 2:13-cv-01005-MHW-TPK** |
| | : | |
| **J.F. Freight Company, Inc.** | : | **Judge Watson** |
| **300 S. Hicks Road** | : | |
| **Palatine, Illinois 60067,** | : | **Magistrate Judge Kemp** |
| | : | |
| **Plaintiffs,** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **v.** | : | |
| | : | |
| **Pilot Travel Centers, LLC** | : | |
| **d/b/a Pilot Flying J** | : | |
| **5508 Lonas Drive** | : | |
| **Knoxville, Tennessee 37909,** | : | |
| | : | |
| **Defendant.** | : | |

## AMENDED COMPLAINT

This case arises from massive fraudulent conduct by the defendant, Pilot Travel Centers, LLC ("Pilot Flying J" or "Defendant") the nation's largest truck stop chain. As a result of an investigation by the Federal Bureau of Investigations ("FBI") that remains ongoing, to date seven employees of Pilot Flying J have agreed to plead guilty to various federal crimes relating to Pilot Flying J's scheme to cheat its customers.[1] Plaintiffs, just a couple of the many companies cheated by Pilot Flying J, seek awards of compensatory and punitive damages for Defendant's

---

[1] The employees who have plead guilty and are awaiting sentencing include: (1) Arnie Ralenkotter, Director of Sales, North; (2) Janet Welch, Senior Account Manager; (3) Kevin Clark, Regional Sales Manager; (4) Scott Fenwick, Regional Sales Manager; (5) Holly Radford, Regional Account Representative; (6) Ashley Judd, Regional Account Representative; and (7) James "Jay" Stinnett, former Regional Sales Manager, later promoted to assisting senior management on matters relating to the operation of the direct sales division.

unlawful conduct as well as the attorneys' fees incurred in prosecuting this action.

## THE PARTIES

1.      Plaintiff FST Express, Inc. ("FST") is an Ohio corporation with its principal place of business at 2040 Atlas Street, Columbus, Ohio 43228.  For over a decade, FST has had a fuel discount contract with Defendant Pilot Flying J under which Defendant was required to credit, refund, or discount a certain percentage of FST's fuel purchases on a regular basis.

2.      Plaintiff J.F. Freight Company, Inc. ("JF") is an Illinois corporation with its principal place of business at 300 South Hicks Road, Palatine, Illinois 60067.  For nearly a decade, JF and its predecessor(s) in interest have had fuel discount contracts with Defendant Pilot Flying J under which Defendant was required to credit, refund, or discount a certain percentage of JF's fuel purchases on a regular basis.

3.      Defendant Pilot Travel Centers, LLC, d/b/a/ Pilot Flying J ("Pilot Flying J"), is a privately held Delaware limited liability company with its company headquarters located at 5508 Lonas Drive, Knoxville, Tennessee 37909.  Pilot Flying J operates truck stops under the Pilot Travel Centers and Flying J Travel Plaza brands.  Upon information and belief, Pilot Flying J is the largest truck stop chain in the United States.

## JURISDICTION AND VENUE

4.      Jurisdiction is proper in this Court pursuant to 18 U.S.C. §1332 because the parties are residents of different states and the amount in controversy exceeds $75,000.00.

5.      This Court has personal jurisdiction over Defendant because Defendant is authorized to do business, and regularly conducts business, in Ohio, and it marketed, sold, and issued its fuel services in Ohio.

6.      Venue is proper under 18 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to FST's claim occurred in this District, FST resides in this

District, and a substantial part of the events or omissions giving rise to JF's claim occurred in this District.

## FACTS

7.     For over a decade, Defendant has solicited Plaintiffs to purchase fuel from Defendant and offered discounted pricing to Plaintiffs.

8.     FST's primary contacts with Defendant have been through Pilot Flying J Regional Sales Manager John Spiewak (on administrative leave), Pilot Flying J Senior Account Manager Janet Welch (pleaded guilty and is awaiting sentencing), and Pilot Flying J Northern Director of Sales Arnie Ralenkotter (pleaded guilty and is awaiting sentencing).

9.     JF's primary contacts with Defendant have been former Pilot Flying J Regional Sales Manager Cathy Sokolowski, former Pilot Flying J Regional Sales Manager Jonathan Duvall (son-in-law to Chief Financial Officer Mitchell Steenrod and later promoted to Director of Sales South), and Pilot Flying J Regional Account Representative Jacquie Pearl. Ralenkotter was the Director of Sales in JF's territory and Heather Jones was the Regional Account Representative in JF's territory.

10.     Defendant Pilot Flying J's primary contact with JF Freight has been through its President, Magdalena Fillman. English is a second language to Fillman. She is originally from Poland and was a physician in Poland by trade. Many years ago, she met her future husband while vacationing in the United States and she eventually moved to the United States. Fillman no longer practices medicine.

11.     Pilot Flying J paid Spiewak, Welch, Sokolowski, Duvall, Pearl, and Ralenkotter commissions and/or bonuses based upon the size of the margins between Defendant's cost for fuel and the amount that Plaintiffs paid for fuel.

**The FST Relationship**

12.     Over the years, Spiewak periodically sweetened the discount deal between FST and Defendant by offering greater discounts.  FST accepted these offers and, in consideration, promised to purchase fuel from Pilot.

13.     At all times relevant herein, FST purchased fuel from Defendant daily.

14.     At various times, Spiewak offered to FST "retail minus" pricing at some locations, "cost plus" pricing at other locations, the "better of" "retail minus" or "cost plus" at certain locations, and checks for the total amount of gallons purchased multiplied by $0.01.  FST accepted these offers and, in consideration, promised to purchase fuel from Pilot.

15.     In the Summer of 2011, Spiewak offered FST the "better of" "cost plus $0.01" or "retail minus $0.05" at all locations, effective July 25, 2010.  FST accepted this offer and, in consideration, promised to purchase fuel from Pilot.

16.     In 2011, FST discovered a discrepancy on invoices that it had received from Pilot Flying J and that were paid: Defendant was not providing the agreed upon discounts, Defendant was overcharging FST, and FST was paying more than the parties had agreed.

17.     After FST notified Defendant that FST was overcharged, on October 21, 2011, Welch falsely told FST's President, Dave Kent, that a discrepancy occurred because "[w]hen we changed your discounts in July our normal discount person was out and there was an error made when flagging the new deal."  This explanation was false and Defendant's representative knew the statement was false when she made it.

18.     FST, however, innocently believed Defendant's false explanation and FST was sent a check for $22,644.66 from Defendant.  Unbeknownst to FST at that time, Defendant was being investigated by the FBI for engaging in fraudulent activity directed towards its customers,

4

such as FST.  Moreover, the discrepancies between the discounts promised to FST and the discounts provided to FST were much greater than FST had realized and to which Defendant had admitted.

### The JF Relationship

19.     Over the years, Pilot Flying J employees Sokolowski, Duvall and Pearl periodically sweetened the discount deal between JF and Defendant by offering greater discounts.  JF accepted these offers and, in consideration, promised to purchase fuel from Defendant.

20.     At all times relevant herein, JF purchased fuel from Defendant daily.

21.     Beginning in early 2005, Defendant promised JF that it would receive fuel price discounts from Defendant for a few cents off of each gallon purchased if JF purchased fuel from Defendant.  JF accepted the offer and purchased fuel from Defendant.

22.     On or about, February 21, 2007, Sokolowski offered "cost plus $0.03" to JF, if JF agreed to continue purchasing fuel from Defendant.  JF accepted the offer and purchased fuel from Defendant.  Defendant, however, did not provide the agreed upon discount and was able to conceal this fact from JF.

23.     In early 2010, Sokolowski promised JF it would receive a discount of "cost plus $0.01" if JF agreed to continue purchasing fuel from Defendant.  JF accepted the offer and purchased fuel from Defendant.  Defendant, however, never provided the agreed upon discount and was able to conceal this fact from JF.

24.     Thereafter, Sokolowski was replaced by Duvall, and Duvall falsely told JF that JF was receiving the agreed upon discount of "cost plus $0.01".

25.     In October 2012, JF suddenly began receiving greater discounts from Defendant when JF told Duvall that a Pilot Flying J competitor had offered JF "cost plus $0.01."

26.     In December 2012, Loves Travel Center offered JF "cost minus $0.02," which prompted Pearl to immediately offer JF "retail minus $0.20" if JF agreed to continue purchasing fuel from Defendant.  JF accepted the offer and purchased fuel from Defendant.  Defendant, however, never provided the agreed upon discount and was able to conceal this fact from JF.

27.     Unbeknownst to JF, Defendant was being investigated by the FBI for engaging in fraudulent activity directed towards its customers, such as JF and FST.

## The Criminal Investigation

28.     Plaintiffs did not learn about the details of the criminal investigation until after April 18, 2013.

29.     Three days prior, on April 15, 2013, the FBI and the Internal Revenue Service ("IRS") raided Defendant's headquarters and other locations, pursuant to a valid search warrant that was filed under seal.

30.     On April 18, 2013, an affidavit that was presented to a federal court to obtain the search warrant was unsealed and made public.  (*See Affidavit of FBI Special Agent Root*, ("Affidavit") attached as Exhibit A).

31.     Generally, the Affidavit reveals that since 2004 (and possibly earlier), Defendant has intentionally failed to provide promised rebates and discounts to its customers, including Plaintiffs.

32.     Moreover, the Affidavit generally reveals that Defendant made it difficult for its customers, including Plaintiffs, to verify that they were receiving the bargained-for rebates and discounts.  Defendants used this to its advantage.  When customers, including Plaintiffs,

questioned the accuracy of the rebates and discounts they were receiving from Defendant, Defendant would provide various excuses and explanations. These excuses and explanations were false and were designed to cover up the fraudulent scheme.

33.  The Affidavit reveals that the investigation began on or about May 4, 2011, when a confidential source—identified in the FBI investigation as "CHS-1"—contacted the FBI and reported knowledge of fraudulent activity by certain of Defendant's employees directed against Defendant's customers.  (*See* Affidavit at 8).

34.  CHS-1 advised the FBI that a current Defendant sales employee, referred to as "CHS-2," had confided to CHS-1 that Defendant employees were intentionally defrauding some of Defendant's customers by deliberately withholding diesel-fuel price rebates and discounts without these customers' knowledge or approval.  CHS-1 agreed to record conversations with CHS-2 regarding Defendant's sales personnel's fraudulent conduct.  (*See* Affidavit).

35.  During the FBI's investigation, the FBI determined that Defendant's employees were defrauding customers by withholding diesel-fuel price rebates and discounts from Defendant's customers, resulting in higher diesel-fuel prices.

36.  Defendant referred to its discount fraud in two ways: (1) "discount fraud" (also known as "managing the discount" and "jacking the discount"), which involves reducing a diesel discount agreement with a customer without the customer's knowledge or approval, and (2) "rebate fraud," which involves reducing a rebate amount due to a customer without the customer's knowledge or approval.

37.  Defendant engaged in discount fraud against its customers, including Plaintiffs, for the purpose of increasing its profitability and increasing the sales commissions and bonuses of its employees.

38.     Defendant's management, at a high level, was aware of the fraudulent activity and participated in it and/or condoned it.  During recorded conversations between CHS-1 and CHS-2 from June 2011 through 2012, CHS-2 explained that Defendant Pilot Flying J's Vice President of Sales, John Freeman, and its Director of National Sales, Brian Mosher, were withholding a portion of the rebate amount due to Defendant's customers who received monthly rebate checks. (*See* Affidavit at 9).

39.     On October 2, 2012, a former Regional Sales Manager for Pilot Flying J, Cathy Giesick, advised FBI agents that Mosher was secretly and illegally lowering customers' discount rate for diesel-fuel purchases.  Giesick explained that once a month, Jones e-mailed an Excel file to Mosher that listed all the customers and rebate amounts due.  Mosher then typed the reduced rebate amount into the Excel file and returned the file to Jones for preparation of rebate checks for the customers.  (*See* Affidavit at 20-21).

40.     Giesick advised the FBI that spreadsheets that detailed the amount that customers' rebates were deceptively reduced were sent to her by another Regional Account Representative, Karen Crutchman.  (*See* Affidavit at 21).  Crutchman also advised Giesick over the phone how much a customer's account should be reduced.  (*See* Affidavit at 21-22).  Further, Crutchman informed CHS-2 that she was cutting customers' discounts without their knowledge, that she maintained spreadsheets tracking her rebate and discount cutting, and that if a customer did not receive daily pricing information, the customer would have a difficult time detecting any rebate or discount reduction.  (*See* Affidavit at 69).

41.     Duvall also advised Giesick that he was aware of the fraudulent process.  (*See* Affidavit at 21).

42.     On November 1, 2012, in an interview at the U.S. Attorney's Office in Fort Worth, Texas, Giesick explained that Defendant used Sales Force, a cloud-based account-management program accessed through salesforce.com.  Mosher instructed Giesick to input into Sales Force what rebate deals her customers were supposed to receive and what rebates Defendant actually gave them.  Giesick explained that if Jones reduced a customer's rebate as instructed by Mosher, Jones would manufacture back-up data to support the reduced rebate amount.  (*See* Affidavit at 22).

43.     On October 4, 2012, CHS-2, the FBI and the IRS contacted one of Defendant's regional directors of sales who agreed to provide information to the agents.  CHS-2 explained that the fraud was directed at both "Direct Billed Customers" and "Restricted/Funded Customers."  CHS-2 also explained that the diesel fuel discount fraud occurred with the knowledge of Defendant's President, Mark Hazelwood, and its Chief Executive Officer, James A. "Jimmy" Haslam, III, because discount fraud activities were discussed at sales meetings in Knoxville, Tennessee where Hazelwood and Haslam were present.

44.     CHS-2 advised that the discount fraud had been occurring at Defendant for more than five years.

45.     The FBI's recorded conversations between the confidential informants and coworkers reveal that actions to further the discount fraud scheme were taken with the apparent awareness and consent of Haslam, Hazelwood, and Chief Financial Officer Mitch Steenrod.  Accordingly, upon information and belief, Haslam, Hazelwood, Steenrod and other top officials were aware of the rampant fraud against Defendant's customers, which included Plaintiff, and approved of it.

46.     The fraudulent rebate and discount scheme became a way of doing business for Defendant.  Employees who engaged in the fraud did so while acting within the course and scope of their employment and Defendant's upper management knew about, ratified and condoned such conduct.

47.     The FBI's recorded conversations reveal that Defendant took active steps to conceal its activities from customers and from law-enforcement officials.

48.     Defendant's employees withheld pricing information from customers who inquired about their rebate amounts.  For instance, if a customer caught a discrepancy, Defendant would blame the discrepancy on a "computer glitch," or other excuses.  (*See* Affidavit at 22).

49.     Code words were used throughout Defendant's corporate structure to discuss the scheme, such as "the gray side" of pricing, "jacking the discount," "costplussing" and "screwing."

50.     The fraudulent scheme was so widespread and well known within Pilot Flying J that Defendant's salespeople viewed the discount fraud scheme as a game.  On October 25, 2012, Freeman said, "We're playin' [expletive omitted] poker with funny money, and it's liar's poker with funny money because of all this cost-plus stuff.  So, you know, I'm not, I don't want to get into a moral or ethical conversation, because I believe that if a guy's gonna f*** you then we got to go to f*** him harder . . . F*** 'em early and f*** 'em often."

51.     At a November 19, 2012 regional sales directors meeting at Freeman's lake house, Mosher instructed Defendant's salespeople on the discount fraud as follows:

> So, again my point is this: Know your customer. Know what you're sending him, know what his preferences are, know how sophisticated he is, okay? If the guy's sophisticated and he truly has gone out and gotten deals from the other competitors and he's getting' daily process from us, don't jack with his discounts, 'cause he's gonna know, okay?

* * *

And I look at my P&L, and my P&L says, "Huh. I'm payin' him $25,000 and we made $25,000 on it. That's not a very good deal for me." I'll probably cut this one down to like 21. This customer is not a very sophisticated buyer and he doesn't know what we've done here, right?"

But, he is sophisticated enough to ask me to provide him a backup. That's why we have to go through this gyration, because then I send this back to Heather and Heather makes a backup equate to $20,996.63. And it shows all the discounts on each location, because that's what the customer's asked for.

* * *

I'm sending cost-plus pricing to a guy that has absolutely no idea what cost-plus pricing is. And he's not gonna take the time to know what it means, 'cause frankly, he's lazy, and he doesn't care. . . . That guy does not deserve premium pricing from us, in my opinion, because he's not willing to go back and do all the work on it.

(*See* Affidavit at 54, 56-57).

52.    Defendant targeted customers whose second language was English. Defendant's regional sales director, Kevin Hascomb, explained as much on February 15, 2012: "[T]here is a language barrier. So you can get away with a little bit more because they know that they are not going to understand everything that you say."

53.    Defendant also targeted customers who used non-party credit lines, referring to them as "low hanging fruit." (*See* Affidavit at 87).

54.    In June 2012, one of Defendant's customers, W. N. Morehouse Truck Line, Inc. ("Morehouse") discovered that over a period of seven years Defendant had shorted it for rebates totaling $146,564.55 from the purchase of 4,187,558.44 gallons of diesel fuel. Morehouse complained to Defendant and requested a check in the amount of its unpaid rebates.

55.    In August 2012, Rob Yuronich, a current Defendant Regional Sales Manager, described Mosher's role in the scheme to CHS-2: "[H]e honestly felt that, that [if] somebody

11

doesn't know and isn't smart enough to know what their deal is and checking it and follow up, should I [] really be giving them the [] deal if I had to . . . ."  Yuronich related that Mosher was involved in deceptively reducing Morehouse's rebates.  (*See* Affidavit at 28).

56.    At the November 19, 2012, regional sales directors meeting at Freeman's lake house, Holly Radford, Defendant's regional sales account representative, laughed when a Defendant colleague recalled the black-and-white pricing at his previous job.  Radford stated, "And what did I tell you. Welcome to the gray side."  (*See* Affidavit at 58-59).

57.    On February 5, 2013, Defendant's employee, Chris Andrews, discussed his role in the discount fraud with CHS-2.  Andrews admitted that he had deceived some customers in his old region about their diesel fuel price discounts; that he had agreed with the deceptive manual rebate practices that Mosher taught; and that on November 19, 2012, he had tried not to detail his manual rebate activities in e-mails based on his experience testifying before the Federal Trade Commission ("FTC") in connection with the Pilot Flying J merger.  (*See* Affidavit at 73).

58.    Defendant's employees made future plans to further implement Defendant's discount fraud.  On February 18, 2013, CHS-2 advised that Freeman and Hazelwood had discussed the possibility of a new internal two-tiered "A" and "B" pricing structure to impose higher prices on less sophisticated customers.  This would be known as "Aunt Bea."

59.    On April 1, 2013, Crutchman informed CHS-2 that Steenrod and Defendant's general counsel Kristen Seabrook had requested information about Defendant's direct sales manual rebate practices.  Crutchman also advised that Director of Inside Sales, Vickie Borden, had requested that all Defendant regional account representatives provide information to her regarding what rebate amounts had been paid to customers, compared with what rebate amounts

should have been paid to customers.  Borden informed Crutchman from that point forward, Seabrook would be approving rebate amounts.  (*See* Affidavit at 88).

60.     Crutchman stated to CHS-2, "we've had these happen before, look at Western Express, that had been the biggest one that we've gotten caught, or, had to go back and pay." (*See* Affidavit at 90-91).  Further, "[y]ou just can't do stuff like this and it not come back to you." *Id*.

61.     On April 9, 2013, Crutchman advised CHS-2 that Seabrook had requested that Crutchman and every other regional account representative supply Seabrook, by the end of the day on April 12, 2013, all information necessary for Seabrook to review, calculate, and approve rebate amounts for customers that were scheduled to go out the week of April 15, 2013, as well as any documents stating what rebate amounts a customer should have received from Defendant compared with what Defendant actually paid the customer, any pricing information sent to a customer, and any document showing an agreed-upon diesel discount price for a customer.  (*See* Affidavit at 98-99).

62.     On April 15, 2013, and pursuant to a lawful search warrant, FBI and IRS agents raided Defendant's corporate headquarters in Knoxville, Tennessee based on probable cause that Pilot Flying J employees had engaged in a conspiracy and scheme to defraud by deceptively withholding diesel-fuel price rebates and discounts from Defendant's customers for the dual purposes of increasing Defendant's profitability and increasing the diesel sales commissions due Defendant's employees who participated in the fraud.  (*See* Affidavit at 99).

### Defendant's Continued Concealment

63.     Subsequently, and although the investigation continues, several of Defendant's employees have plead guilty to criminal charges and are awaiting sentencing.  Those employees

13

include: (1) Arnie Ralenkotter, Director of Sales, North; (2) Janet Welch, Senior Account Manager; (3) Kevin Clark, Regional Sales Manager; (4) Scott Fenwick, Regional Sales Manager; (5) Holly Radford, Regional Account Representative; (6) Ashley Judd, Regional Account Representative; and (7) James "Jay" Stinnett, former Regional Sales Manager, later promoted to assisting senior management on matters relating to the operation of the direct sales division.

64.     Nevertheless, over the past several months, Defendant has continued to attempt to conceal its fraud from FST, JF, and other customers.

65.     Spiewak has falsely stated to FST and other customers that no one in his territory had any discrepancies, and that only customers that received rebate checks had discrepancies.

66.     Contrary to Spiewak's false assertions, FST was overcharged and FST was not a customer that received rebate checks.

67.     Just recently, on September 27, 2012, Defendant placed Spiewak on "administrative leave."

68.     During the week of June 10, 2013, Pearl and Mark Hazlewood, Defendant's President, paid a visit to JF. Fillman had neither met nor spoken to Hazlewood prior to this meeting.

69.     To begin the meeting, the first thing that Hazlewood wanted to know was whether or not JF's discount deals were in writing. When Fillman explained to Hazlewood that the there was an oral agreement between Defendant and JF, Hazlewood abruptly proclaimed that Defendant could not help JF with respect to any discount discrepancies.

70.     About a week later, JF addressed this issue with Defendant's Chief Executive Officer, James A. Haslam, III. Haslam apologized for Defendant's conduct, and soon thereafter,

14

JF Freight was sent a check from Defendant for $12,215.57, purportedly due to a discrepancy Defendant had found with JF's account.  The amount was calculated by Defendant.

71.     The $12,215.57 check is a gross, and upon information and belief, deliberate, under calculation of the amount Defendant owes JF.  That amount is a small fraction of the promised discounts Defendant wrongfully withheld from JF.

72.     As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered losses in excess of $75,000.00.

## COUNT I
## FRAUD

73.     Plaintiffs allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

74.     Defendant made false statements to FST.  Defendant told FST's President, Dave Kent, that FST would receive "cost plus" pricing at some locations, "retail minus" pricing at other locations, the "better of" "cost plus" pricing or "retail minus" pricing at certain locations, and checks for the total amount of gallons purchased multiplied by $0.01, however, Defendant did not provide Plaintiff with such pricing and Defendant unilaterally stopped sending the checks.  When Defendant made these promises, it never intended to keep them.  Defendant sent invoices and price information to FST knowing that they contained false information and knowing that FST would be misled to believe that Defendant was providing the agreed upon discounts.  Defendant concealed from Plaintiff that Defendant was intentionally "cost plussing" Plaintiff and "jacking" Plaintiff's discount.  Specifically, Defendant was secretly adjusting the discount to benefit Defendant and deprive Plaintiff of the discount to which Plaintiff and Defendant had agreed.  In one instance, and to cover up its deception, Defendant falsely stated to Plaintiff's President, Dave Kent, that there was a discrepancy because Defendant's "normal

discount person was out and there was an error made when flagging the new deal." Defendant falsely stated that the discrepancy was only $22,644.66, when the overcharge was, in fact, much greater. Defendant concealed from Plaintiff that it never intended to provide Plaintiff with the agreed upon discounts so that Defendant and its employees could benefit from the fraud.

75.     Defendant made false statements to JF. On or about February 21, 2007, Sokolowski falsely told JF's President, Magdalena Fillman that JF would receive "cost plus $0.03." In early 2010, Sokolowski falsely told Fillman that JF would receive "cost plus $0.01." Duvall falsely claimed that JF was receiving "cost plus $0.01." In December 20102, Pearl falsely told JF's President that JF would receive "retail minus $0.20." However, Defendant did not provide JF with such discounts. When Defendant made these promises, it never intended to keep them. Defendant sent invoices and price information to JF knowing that they contained false information and knowing that JF would be misled to believe that Defendant was providing the agreed upon discounts. Defendant concealed from JF that Defendant was intentionally "cost plussing" JF and "jacking" JF's discount. Specifically, Defendant was secretly adjusting the discount to benefit Defendant and deprive JF of the discount to which JF and Defendant had agreed. Defendant provided JF with written account statements that were deliberately confusing and misleading in an effort to mask the fraudulent scheme. In one instance, and to cover up its deception, Defendant sent a check of $12,215.57 to JF to try to make JF think that was all that was owed. Defendant falsely stated that the discrepancy was only $12,215.57, when the discounts withheld were, in fact, much greater. Defendant concealed from JF that it never intended to provide JF with the agreed upon discounts so that Defendant and its employees could benefit from the fraud.

76.     The facts concealed by Defendant and Defendant's false statements to Plaintiffs

were material to the parties' transactions.  Plaintiffs would have purchased more or all of its fuel from Defendant's competitors and less or none of its fuel from Defendant had Plaintiffs known that Defendant's representations to Plaintiff regarding its discounts were false and/or known that Defendant was deliberately concealing accurate information from Plaintiff.

77.     Defendant concealed facts knowing that Plaintiffs had a false impression regarding the accuracy of the discounts Plaintiffs were receiving, and/or with such utter disregard and recklessness for the truth that such knowledge may be inferred.  Defendant concealed the true facts regarding its fraudulent discount scheme knowing that Plaintiffs had no apparent reason to doubt Defendant's express promises.

78.     Defendant made false statements to FST's President, Dave Kent, with knowledge of their falsity, and/or with such utter disregard and recklessness as their truth or falsity that such knowledge may be inferred.  Defendant, Spiewak, Ralenkotter, and Welch knew that Defendant would not provide the discounts that they expressly promised to FST's President, Dave Kent, because they had been engaging in "cost plussing" and "jacking the discount" with almost all of Defendant's customers for approximately a decade (and perhaps longer).

79.     Defendant made false statements to JF's President, Magdalena Fillman, with knowledge of their falsity, and/or with such utter disregard and recklessness as their truth or falsity that such knowledge may be inferred.  Defendant, Sokolowski, Duvall, and Pearl knew that Defendant would not provide the discounts that they expressly promised to JF's President, Magdalena Fillman, because they had been engaging in "cost plussing" and "jacking the discount" with almost all of Defendant's customers for approximately a decade (and perhaps longer).

80.     Defendant concealed facts from Plaintiffs and made false statements to Plaintiffs

17

with the intent of misleading Plaintiffs into relying upon the statements and omissions.

Defendant concealed from Plaintiffs and their respective Presidents that it never intended to

provide Plaintiffs with the agreed-upon discounts promised to Plaintiffs so that Defendant and its

employees could make more money from larger margins between the actual cost to Defendant

and the cost charged to Plaintiffs.

81.     Plaintiffs justifiably relied upon Defendant's false statements and omissions of

concealed facts.  Plaintiffs and their respective Presidents innocently believed the false

statements and omissions as set forth above and, in particular, as contained in Paragraphs 74 and

75, and had no reason to believe otherwise.

82.     Defendant knowingly concealed material facts from Plaintiffs with the intent to

mislead Plaintiffs into relying upon false statements.  As a result of Defendant's concealment,

Plaintiffs relied upon Defendant's false statements, Plaintiffs' reliance was justifiable, and

Plaintiffs suffered injury *via* overcharges and/or withheld discounts as a result.  FST also did not

further investigate the 2011 discrepancy until 2013 due to Welch's assurance that the

discrepancy was a mistake in flagging the new deal.

83.     Defendant had a legal obligation to disclose its illegal behavior to Plaintiffs but

chose not to, instead choosing to wrongfully conceal Plaintiffs' rightful fuel rebates and

discounts by conducting its scheme in secret.  Plaintiffs did not learn of Defendant's fraudulent

scheme until April 2013.

84.     Plaintiff have exercised due diligence and have investigated this matter even

though Defendant has continued to attempt to defraud Plaintiffs and other customers.

85.     As a direct and proximate result of Defendant's false statements and omissions of

concealed facts, Plaintiffs have been injured.

86.    Plaintiffs are entitled to compensatory damages, punitive damages, interest, costs, expenses, and attorneys' fees from Defendant.

## COUNT II
## BREACH OF CONTRACT

87.    Plaintiffs allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

88.    As previously set forth, each of the Plaintiffs, on the one hand, and Defendant, on the other hand, mutually intended to form and, in fact, entered into, valid and enforceable oral fuel discount contracts under which Defendant was required to credit, refund, or discount a certain percentage of Plaintiffs' fuel purchases.  Said contracts were all capable of being performed within one year.

89.    Plaintiffs performed all conditions precedent to Defendant's liability under these contracts.  Plaintiffs performed all of their obligations under the contracts by patronizing Defendant's truck stops, purchasing fuel, purchasing other goods and services, and paying their bills.

90.    Defendant performed some of its obligations under the contracts by providing fuel services to Plaintiffs and by providing some, but not all, of the promised discounts.

91.    Defendant's offer, Plaintiff's acceptance, and the exchange of consideration created binding contracts between Defendant and Plaintiffs.

92.    Defendant breached its contracts with Plaintiffs by, among other things, reducing and withholding Plaintiffs' agreed upon discounts and/or overcharging Plaintiffs.

93.    Defendant's breaches of its contract with Plaintiffs directly and proximately caused Plaintiffs to suffer actual and consequential damages such as reduced fuel rebates, reduced fuel discounts, and/or adverse , and Plaintiff is entitled to its actual and consequential

19

damages, punitive damages, interest, and costs.

**COUNT III**
**VIOLATION OF OHIO'S DECEPTIVE TRADE PRACTICES ACT**

94.     Plaintiffs allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

95.     Defendant is a "person" as defined in O.R.C. § 4165.01(D).

96.     In violation of O.R.C. § 4165.02, Defendant engaged in the following false, unfair, deceptive, untrue, and misleading activities:

> (A)(7) Represent[ing] that . . . goods or services . . . have . . . characteristics [or] benefits . . . that they do not have;
>
> (A)(11) Advertis[ing] services with intent not to sell them as advertised; and
>
> (A)(12) Mak[ing] false statements of fact concerning the reasons for, existence of, or amounts of price reductions.

97.     Defendant's willful violations directly and proximately caused damage to Plaintiff.

98.     Pursuant to O.R.C. § 4165.03(A)(2), FST is entitled to recover its actual damages, plus costs and interest.

99.     Pursuant to O.R.C. § 4165.03(B), Plaintiff is entitled to its attorneys' fees since Defendant willfully committed the foregoing deceptive trade practices, knowing them to be deceptive.

**COUNT IV**
**VIOLATION OF ILLINOIS' DECEPTIVE TRADE PRACTICES ACT**

100.     Plaintiffs allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

101.     Defendant is a "person" as defined in Title 815 Section 510/1 of the Illinois

20

Compiled Statutes.

102.    In violation of 815 ILCS 510/2, Defendant engaged in the following deceptive

activities:

> (a)(5) Represent[ing] that . . . goods or services . . . have . . .
> characteristics [or] benefits . . . that they do not have;
>
> (a)(9) Advertis[ing] services with intent not to sell them as advertised;
> and
>
> (a)(11) Mak[ing] false statements of fact concerning the reasons for,
> existence of, or amounts of price reductions.

103.    Defendant's willful violations directly and proximately caused damage to JF.

104.    JF is entitled to recover its actual damages, plus costs and interest.

105.    Pursuant to 815 ILCS 510/3, JF is entitled to its attorneys' fees since Defendant

willfully committed the foregoing deceptive trade practices, knowing them to be deceptive.

## <u>COUNT V</u>
### VIOLATION OF TENNESSEE'S CONSUMER PROTECTION ACT

106.    Plaintiffs allege and incorporate by reference every allegation set forth in the

preceding paragraphs as though alleged in this Count.

107.    Defendant and Plaintiffs are "persons" under § 47-18-103 of Tennessee's

Consumer Protection Act.

108.    In violation of § 47-18-103 of Tennessee's Consumer Protection Act, Defendant

engaged in the following false, unfair, deceptive, untrue activities:

> (b)(5) Representing that goods or services have . . . characteristics [or] . . .
> benefits that they do not have;
>
> (b)(9) Advertising goods or services with intent not to sell them as advertised; and
>
> (b)(11) Making false or misleading statements of fact concerning the reasons for,
> existence of, or amounts of price reductions . . .

109.     Defendant's willful violations of Tennessee's Consumer Protection Act directly and proximately caused damage to Plaintiffs.

110.     Defendant willfully and/or knowingly used or employed unfair and deceptive acts and practices and Plaintiffs are entitled to three (3) times the actual damages, attorneys' fees, costs, interest, and other relief that the Court considers necessary and proper.

**COUNT VI**
**CONVERSION**

111.     Plaintiffs allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

112.     Defendant wrongfully and intentionally assumed control over the property of Plaintiffs in a manner that is inconsistent with the rights of Plaintiffs.

113.     As a direct and proximate result of Defendant's acts of conversion, Plaintiffs have suffered injuries, and Plaintiffs are entitled to compensatory damages, punitive damages, interest, costs, and attorneys' fees.

**COUNT VII**
**UNJUST ENRICHMENT**

114.     Plaintiffs allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

115.     As a result of Plaintiffs overpaying for their fuel and not receiving the promised discounts, Plaintiffs conferred a benefit upon Defendant, Defendant retained benefits, and Defendant received and retained these benefits under such circumstances that it would be inequitable and unconscionable to permit Defendant to retain this benefit without paying its reasonable value to Plaintiffs.

116.     As a direct and proximate result of Defendant's unjust enrichment, Plaintiffs

suffered injury and seek orders directing Defendant to return to them the amount that Plaintiffs improperly paid to Defendant and the discounts improperly withheld by Defendant, plus interest and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs each seek judgment against Defendant in excess of $75,000.00, as follows:

A.   With respect to Count I, orders finding that Defendant committed fraud against Plaintiffs and awarding Plaintiffs their compensatory damages, punitive damages, costs, attorneys' fees, and interest;

B.   With respect to Count II, orders finding that Defendant breached its contracts with Plaintiffs and awarding Plaintiffs their actual and consequential damages, punitive damages, costs, attorneys' fees, and interest;

C.   With respect to Count III, an order finding that Defendant violated Ohio's Deceptive Trade Practices Act and awarding FST actual damages, costs, attorneys' fees, and interest;

D.   With respect to Count IV, an order finding that Defendant violated Illinois' Deceptive Trade Practices Act and awarding JF actual damages, costs, attorneys' fees, and interest;

E.   With respect to Count V, orders finding that Defendant violated Tennessee's Consumer Protection Act and awarding Plaintiffs their actual damages, treble damages, costs, attorneys' fees, and interest;

F.   With respect to Count VI, orders finding that Defendant committed conversion with respect to Plaintiffs' property and awarding Plaintiffs their compensatory damages, punitive damages, costs, attorneys' fees, and interest;

G.   With respect to Count VII, orders in favor of Plaintiffs declaring that Defendant was unjustly enriched and ordering disgorgement of Defendant's ill-gotten gains or that Defendant make restitution to Plaintiffs, plus costs and interest;

H.   An order awarding pre-judgment and post-judgment interest as applicable; and

I.    An order awarding all other relief as may be just and appropriate.


Date: October 11, 2013                    Respectfully Submitted,

                                          /s/ Shawn J. Organ
                                          Shawn J. Organ (0042052)
                                          Trial Attorney
                                          Douglas R. Cole (0070665)
                                          **ORGAN COLE + STOCK LLP**
                                          1335 Dublin Road, Suite 104 D
                                          Columbus, Ohio  43215
                                          614.481.0900
                                          614.481.0904 (f)
                                          (sjorgan@ocslawfirm.com)
                                          (drcole@ocslawfirm.com)

                                          *Attorneys for Plaintiffs*
                                          *FST Express, Inc.*
                                          *and J.F. Freight Company, Inc.*


## JURY DEMAND

Plaintiff demands trial by jury on all triable issues.

                                          /s/ Shawn J. Organ
                                          Shawn J. Organ

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on October 11, 2013, a copy of the foregoing was

served by certified mail upon the following:

> Pilot Travel Centers, LLC
> d/b/a/ Pilot Flying J
> c/o Statutory Agent
> CT Corporation System
> 1300 East Ninth Street
> Cleveland, OH  44114
>
> Pilot Travel Centers, LLC
> d/b/a Pilot Flying J
> 5508 Lonas Drive
> Knoxville, TN  37909

.

> /s/ Shawn J. Organ
> One of the Attorneys for Plaintiffs